UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X     Case No.
DR. KONSTANTINOS GASTERATOS,

                Plaintiff,

       -against-

ELMEZZI GRADUATE SCHOOL OF MOLECULAR
MEDICINE, NORTHWELL HEALTH, INC.,
THE FEINSTEIN INSTITUTE FOR MEDICAL RESEARCH,
NORTH SHORE UNIVERSITY HOSPITAL,
DR. DANIEL A. GRANDE and DR. ANNETTE T. LEE,

                Defendants.
-----------------------------------------------------------------------X

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Dr. Konstantinos Gasteratos ("Plaintiff" or "Dr. Gasteratos") alleges against the Defendants Elmezzi Graduate School of Molecular Medicine ("Elmezzi"), Northwell Health, Inc. ("Northwell"), the Feinstein Institute for Medical Research ("Feinstein"), North Shore University Hospital, Dr. Daniel A. Grande and Dr. Annette T. Lee (collectively "Defendants"), upon information and belief, as follows:

## NATURE OF THE CLAIMS

1. Plaintiff brings this action against the Defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.* ("Title VII"), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") and the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL") to recover the damages he sustained as the result of being subjected to *quid pro quo* sexual harassment, hostile work environment, discriminated against, and retaliated against on the basis of his sex/gender and disability.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's claims under Title VII and Title IX pursuant to 28 U.S.C. § 1331 and 1343, because those claims arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over Plaintiff's related NYSHRL claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

4. On October 20, 2022, Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") against the corporate Defendants, and was assigned a charge number 520-2022-00093. On October 25, 2022, following Plaintiff's termination on October 21, 2022, Plaintiff filed an amended charge of discrimination with the EEOC.

5. On July 17, 2023, EEOC issued Plaintiff Notice of Right to Sue (annexed hereto as Exhibit A).

6. Plaintiff has exhausted administrative remedies, and any and all other prerequisites to the filing of this suit have been met.

## THE PARTIES

**Plaintiff Dr. Gasteratos**

7. Plaintiff is a self-supporting healthcare professional (Plastic Surgeon) in good standing.

8. Plaintiff is homosexual man and is protected from unlawful discriminatory practices under Title VII, Title IX and NYSHRL.

9. Plaintiff is a citizen of Greece who was accepted to be a student and/or employee at Elmezzi.

10. Plaintiff came to the United States as a J-1 Scholar within the J-1 Exchange Research Scholar Program with the United States Department of State ("J-1").

11. The J-1 non-immigrant visa category is for individuals approved to participate in work-and study-based exchange visitor programs.

**Elmezzi**

12. Elmezzi is a private graduate college, located at 350 Community Drive, Manhasset, NY 11030.

13. Elmezzi is an individually tailored three-year program designed to train exceptional physicians with a recent MD or equivalent degree in research methodologies, culminating in a PhD in Molecular Medicine.

14. Elmezzi is located at North Shore University Hospital.

15. Elmezzi is part of Feinstein, which is Northwell's principal research facility.

16. Elmezzi is supported in part through a generous endowment from the Thomas and Jeanne Elmezzi Foundation.

17. Upon information and belief, professors from the different labs at Elmezzi receive NIH/federal grants.

18. Plaintiff's "job title" at Elmezzi was "Elmezzi Scholar".

19. Plaintiff worked at the "Elmezzi" "department".

20. Elmezzi, through its agents and employees, provided Plaintiff with tools and instrumentalities necessary for the performance of Plaintiff's duties and responsibilities such as performing experiments relevant to Plaintiff's PhD study, collaborating with lab staff and students, communicating and presenting Plaintiff's findings with his mentor, Dr. Daniel A. Grande, and committee members, attending and participating in classes (*e.g.* Neuroscience, Journal club, *etc.*), staying up-to-date with current research in Plaintiff's field of study (*i.e.* regenerative medicine).

**Feinstein**

21. Feinstein is a domestic not-for-profit corporation organized and existing under and by virtue of the laws of the State of New York.

22. Feinstein is located at 350 Community Drive, Manhasset, New York 11030.

3

23. Feinstein is the home of research at Northwell.

24. Feinstein is located at North Shore University Hospital.

25. Plaintiff position at Feinstein was "University Post Grad Medical Trainee".

26. Feinstein was listed as "Primary Site of Activity" on DS form, Plaintiff's application for J-1 visa.

27. Feinstein was Plaintiff's employer within the meaning of Title VII and NYSHRL.

28. Feinstein, through its agents and employees, controlled the terms and conditions of Plaintiff's employment.

29. Feinstein, through its agents and employees, provided Plaintiff with tools and instrumentalities necessary for the performance of Plaintiff's duties and responsibilities such as attending and participating in educational events organized by Feinstein (*e.g.* May 25, 2022 - OHEKA Castle, Feinstein Academy of Scholars Symposium, poster sessions), PhD defense presentations and so on.

**Northwell**

30. Northwell is a domestic not-for-profit corporation organized and existing under and by virtue of the laws of the State of New York.

31. Northwell is a nonprofit integrated healthcare network that is New York State's largest healthcare provider and private employer, with more than 81,000 employees.

32. Northwell is headquartered at 2000 Marcus Avenue, New Hyde Park, New York 11042.

33. Plaintiff's paychecks and W-2s were issued by Northwell, as agent for Feinstein.

34. Northwell was Plaintiff's employer within the meaning of Title VII and NYSHRL.

35. Northwell, through its agents and employees, controlled the terms and conditions of Plaintiff's employment.

36. Northwell, through its agents and employees, provided Plaintiff with tools and instrumentalities necessary for the performance of Plaintiff's duties and responsibilities such as attending pre-employment checks/appointments with medical stuff, security (ID badge, fingerprints), collaborating with clinicians as part of Plaintiff's PhD study, collecting clinical samples from different locations within Northwell hospitals/healthcare settings and so on.

**North Shore University Hospital**

37. North Shore University Hospital is a flagship hospital of Northwell.

38. North Shore University Hospital is a domestic not-for-profit corporation organized and existing under and by virtue of the laws of the State of New York.

39. North Shore University Hospital is located at 300 Community Dr. Manhasset, New York 11030.

40. North Shore University Hospital was listed on Plaintiff's J-1 visa.

41. North Shore University Hospital is listed as "Program Sponsor" on DS form, Plaintiff's application for J-2 visa.

42. The security desk at North Shore University Hospital issued Plaintiff a badge, which he used daily to enter the Feinstein.

43. North Shore University Hospital was Plaintiff's employer within the meaning of Title VII and NYSHRL.

44. North Shore University Hospital, through its agents and employees, controlled the terms and conditions of Plaintiff's employment.

45. North Shore University Hospital, through its agents and employees, provided Plaintiff with tools and instrumentalities necessary for the performance of Plaintiff's duties and responsibilities such as librarian services necessary for Plaintiff's work and study.

46. The Defendants were Plaintiff's joint employer:

a. Defendants all suffered or permitted Plaintiff to work.

b. Each of the Defendants acted directly or indirectly in the interest of one another in relation to Plaintiff.

c. Defendants all simultaneously benefitted from Plaintiff's work.

d. Defendants each had either functional and/or formal control over the terms and conditions of Plaintiff's work.

e. Plaintiff performed work integral to each Defendant's operation.

f. Each Defendant had substantial control over Plaintiff's working conditions and over the unlawful policies and practices alleged herein.

g. Defendants' operations were interrelated and unified.

h. Defendants shared a common management and was centrally controlled and/or owned by Defendants.

47. In that regard, Elmezzi is an integral part of Northwell, and operates in conjunction with the Feinstein, which is the research entity of Northwell and which provides all of the facilities and infrastructure for the Elmezzi.

48. Through its connection to Northwell, Elmezzi and its faculty bridge the gap between biomedical research and patient care.

49. The faculty and students of Elmezzi collaborate with clinicians (physicians, dentists, medical students, fellows and residents) throughout Northwell to identify critical unanswered questions relating to diseases treated in the hospitals.

50. The Elmezzi Board of Directors acts on behalf of the Trustees of Northwell.

51. The Elmezzi faculty is drawn from the faculty of the Feinstein.

52. The President of the Elmezzi, Dr. Kevin Tracey, is also President and CEO of the Feinstein.

**Defendant Dr. Daniel A. Grande**

53. Dr. Daniel A. Grande was and is the Chairperson of the Admission Committee, Professor and Assistant Vice President of Research Services at Feinstein.

54. During the entirety of Plaintiff's employment with the Defendants, Dr. Daniel A. Grande had the right to hire, fire, promote, reward and sanction Plaintiff.

55. During the entirety of Plaintiff's employment with the Defendants, Dr. Daniel A. Grande was Plaintiff's supervisor and/or manager.

56. Dr. Daniel A. Grande's office was located at 350 Community Drive, Manhasset, New York 11030, on the ground floor, to the left as entering the Feinstein building/security desk. Dr. Daniel A. Grande's lab was situated approximately 16 ft away and across from his office in the same corridor, and approximately 32 ft away from Plaintiff's desk. Plaintiff's desk and Dr. Daniel A. Grande's office were in a very close proximity.

**Defendant Dr. Annette T. Lee**

57. Dr. Annette T. Lee was and is the Associate Professor and Dean at Elmezzi.

58. During the entirety of Plaintiff's employment with the Defendants, Dr. Annette T. Lee had the right to hire, fire, promote, reward and sanction Plaintiff.

59. During the entirety of Plaintiff's employment with the Defendants, Dr. Annette T. Lee was Plaintiff's supervisor and/or manager.

60. As the Chairperson of the Admissions Committee, Dr. Daniel A. Grande and Dr. Annette T. Lee took a direct role in bringing Plaintiff over to the United States on a J-1 visa as a Research Scholar/medical trainee.

## STATEMENT OF FACTS

61. On April 8, 2021, Plaintiff was accepted into the Elmezzi.

62. Plaintiff's acceptance to Elmezzi was contingent upon Plaintiff's satisfactory completion of a thesis research proposal which was to be presented to Plaintiff's advisory committee within six months of beginning of Plaintiff's employment.

63. Following acceptance of Plaintiff's research proposal, Plaintiff was to be fully accepted into the program, with a minimum requirement of three years in residence in total.

64. On October 25, 2021, Plaintiff commenced his employment with the Defendants.

65. Plaintiff's starting salary was $70,000 per year.

66. Plaintiff was entitled to various benefits, such as medical, dental, vision insurance; long-term-disability benefits; life insurance; 401K and transit PT.

67. During Plaintiff's employment, Plaintiff had a set schedule: Monday through Friday, from 9am. to 5p.m.

68. On average, Plaintiff worked at 350 Community Drive, Manhasset, New York 11030, ground floor within the Dr. Daniel A. Grande's lab (Orthopedic Research Laboratory).

69. In addition to performing academic work, Plaintiff was assigned to work on various other projects related to nerve regeneration, ear and hand abnormalities, cartilage and diabetic foot ulcer repair in collaboration with clinicians from Northwell and researchers at Feinstein.

70. During his employment, Plaintiff was a stellar employee.

71. During his employment, Plaintiff satisfactory performed his duties and responsibilities.

72. From the onset of Plaintiff's employment, despite his outstanding work performance, Plaintiff became the target of unlawful sexual harassment by his immediate supervisor Dr. Daniel A. Grande.

**Sexual Harassment**

73. On the second day of Plaintiff's employment, on or about October 26, 2021, Dr. Daniel A. Grande told Plaintiff that he "**know[s] a beautiful Greek lady**", who he would like to introduce Plaintiff to.

74. Dr. Daniel A. Grande suggested that Plaintiff should go out with her.

75. Plaintiff politely declined and indicated that he was not interested.

76. Dr. Daniel A. Grande proceeded asking, **"Are you gay?"**

77. Although Plaintiff found this inquiry to be highly inappropriate for the workplace, he responded affirmatively.

78. Shortly after Plaintiff commenced his employment with the Defendants, Dr. Daniel A. Grande offered Plaintiff a ride to a Dick's store to get some clothes, which Plaintiff politely declined.

79. Dr. Daniel A. Grande also invited Plaintiff to join him on his boat for fishing, which Plaintiff declined.

80. On another occasion, Dr. Daniel A. Grande told Plaintiff that Plaintiff should **"Get an SUV, because guys with SUVs have big cocks!"**

81. When making said comment, Dr. Daniel A. Grande placed both of his hands in his crotch simulating a large penis while leaning backwards in his office chair.

82. Plaintiff found this behavior to be highly inappropriate for the workplace, but remained silent in fear of retaliation.

83. On one occasion, as Plaintiff was writing an abstract for an upcoming conference (American Society of Plastic Surgeons (ASPS) Plastic Surgery in Toronto, Canada) with an approaching deadline, Plaintiff went to Dr. Daniel A. Grande's office to ask a work-related question.

84. While responding to Plaintiff's work-related inquiry, Dr. Daniel A. Grande said, **"You don't want to be caught with your dick out!"** referring to deadlines.

85. Plaintiff continually ignored Dr. Daniel A. Grande's lewd comments, which he found to be highly inappropriate.

86. Dr. Daniel A. Grande instructed Plaintiff to **"Keep this between us!"** (referring to his sexual in nature comments).

87. When Plaintiff discussed his research project with Dr. Daniel A. Grande, Dr. Daniel A. Grande said **"Women that ride horses are horny!"**

88. Dr. Daniel A. Grande also told Plaintiff that Dr. Annette T. Lee, the Dean at Elmezzi, always shared the details of her dating life with him.

89. According to Dr. Daniel A. Grande, Dr. Annette T. Lee complimented his (Dr. Daniel A. Grande's) beard, and allegedly said that she would like to have it **"between [her] thighs!"**

90. Plaintiff found this conduct to be highly inappropriate for the workplace.

91. On various occasions, Dr. Daniel A. Grande unpromptedly talked to Plaintiff about the various sexual scandals that he was interested in learning about.

92. For example, Dr. Daniel A. Grande told Plaintiff that a surgeon at Northwell he knew slept with his secretary and he then fired her.

93. By way of another example, Dr. Daniel A. Grande told Plaintiff that another surgeon punched another surgeon in a conference when he found out that he had slept with his wife.

94. By way of another example, Dr. Daniel A. Grande told Plaintiff that Dr. James Devoti from the lab next door cheated on his wife with Dr. Daniel A. Grande's secretary, and Dr. Devoti's wife divorced him and kicked him out of their house as a result.

95. Dr. Daniel A. Grande's inappropriate comments made Plaintiff feel extremely uncomfortable.

96. Plaintiff was not aware of what avenues were available to him so he could report the sexual harassment he was subjected to.

97. The Defendants did not conduct any training designed to prevent sexual harassment/discrimination at the workplace until on or about February 7, 2022.

98. At the commencement of Plaintiff's employment, he received only a student handbook, but no employee handbook.

99. Because Dr. Daniel A. Grande was Plaintiff's superior and mentor, Plaintiff was afraid to speak up in fear of retaliation.

100. On one occasion, Dr. Daniel A. Grande suggested that Plaintiff **"Should go to Chelsea in Manhattan, because there are a lot of gay bars there!"**

101. On another occasion, Dr. Daniel A. Grande complimented Plaintiff's haircut.

102. In or around the end of 2021, Dr. Daniel A. Grande asked Plaintiff what Plaintiff did for Christmas.

103. When Plaintiff responded that he spent it with a friend of his, Dr. Daniel A. Grande kept asking, **"Is it a guy from the building?"**, **"Is it a guy from Great Neck?"**

104. Plaintiff found these inquiries to be intrusive and inappropriate and kept discussing work instead.

105. Dr. Daniel A. Grande proceeded to suggest that Plaintiff **"Should go out with Julien Papoin and his friends!"**, a research manager at Dr. Lionel Blanc's lab.

106. Dr. Daniel A. Grande made that suggestion only because Julien Papoin, according to Dr. Daniel A. Grande, was also gay.

107. On another occasion, Dr. Daniel A. Grande told Plaintiff that Dr. Lionel Blanc and Julien Papoin were **"Seen together at a gay bar!",** implying that they had an affair despite Dr. Lionel Blanc being married to a woman and having two kids.

108. On another occasion, Dr. Daniel G. Grande told Plaintiff about Dr. Kate Nellans, a hand surgeon from Northwell, who was married, and had four children, but was, according to Dr. Daniel A. Grande, a lesbian.

109. On another occasion, Dr. Daniel A. Grande told Plaintiff about Dr. Max Brenner, an Associate Professor at Dr. Ping Wang's lab, who was "Gay and married!"

110. The above-referenced comments made Plaintiff feel extremely uncomfortable and created a hostile work environment for Plaintiff, which a reasonable person would not be able to tolerate.

111. On a regular and pervasive basis, Dr. Daniel A. Grande frequently placed his hand on his crotch while talking to Plaintiff.

112. On a regular and pervasive basis, Dr. Daniel A. Grande stared at Plaintiff's crotch, which made Plaintiff feel even more uncomfortable.

113. In or around February 2022, while Plaintiff was in Dr. Daniel A. Grande's office, Dr. Daniel A. Grande came up very close to Plaintiff and propositioned Plaintiff sex.

114. Plaintiff was appalled by Dr. Daniel A. Grande's inappropriate conduct.

115. He did not consent. He kept quiet for fear of retaliation.

116. Dr. Daniel A. Grande asked Plaintiff if he can call Plaintiff **"Connie"** (short name for Constance/Konstantinos).

117. Plaintiff immediately rejected such a proposition.

118. Dr. Daniel A. Grande then started calling Plaintiff **"Buddy"** and **"my man"** which Plaintiff also found to be inappropriate.

119. Dr. Daniel A. Grande told Plaintiff that he had called Michelle Aparicio, CPIA (Director, IACUC & IBC, Animal Welfare Office) a **"bitch"** in an email, and he was laughing about it while Plaintiff was shocked by his unprofessionalism.

120. Dr. Daniel A. Grande said, **"I don't want to have prostate surgery because I want to be able to cum"; "Of all the diseases, why would I get the one affecting my dick?"**

121. In February 2022, while Plaintiff was taking the neuroscience class, Dr. Daniel A. Grande asked Plaintiff to report to him if Plaintiff had concerns regarding Dr. Patricio Huerta's neuroscience class, so he could then escalate to Dean Annette T. Lee, PhD because Dr. Daniel A. Grande wanted to **"fuck him"**.

122. Because of Plaintiff's repeated rejection of Dr. Daniel A. Grande sexual advances, Dr. Daniel A. Grande started taking actions which adversely affected Plaintiff's employment.

123. By way of example, Dr. Daniel A. Grande was intentionally very vague as to Plaintiff's goals, causing Plaintiff to fall behind his thesis schedule.

124. Dr. Daniel A. Grande never set any specific milestones to be achieved for Plaintiff's PhD work or deadlines to meet.

125. Dr. Daniel A. Grande never followed up to check on Plaintiff's progress.

126. Dr. Daniel A. Grande would then reprimand Plaintiff, saying, **"Get the work done, or you will go back to Greece!"**

127. Previously, prior to rejecting his advances, Dr. Daniel A. Grande said he would bring a lab technician to help Plaintiff with procedures in the lab, and that Pooja Swami (research associate) and Henintsoa Fanjaniaina (visiting scholar), both of whom reported to Dr. Daniel A. Grande would also help Plaintiff. In that regard, Dr. Daniel A. Grande ran the lab, had the authority to hire and fire lab personnel, had the authority to oversee grants/ finances, *etc*.

128. Following Plaintiff's rejections, however, Dr. Daniel A. Grande deprived Plaintiff of such support.

129. In addition, prior to Plaintiff's rejections of Dr. Daniel A. Grande's sexual advances, Dr. Daniel A. Grande had no issues with other lab employees (*e.g.* Hudson Liang, MD, Dan Li,

PhD, Pooja Swami, MS, Henintsoa Fanjaniaina A., BE, Jedediah Bondy, BS and Camille Pinpin, BS) assisting Plaintiff with his work assignments and research.

130. Following Plaintiff's rejections of Dr. Daniel A. Grande's sexual advances, however, Dr. Daniel A. Grande started reprimanding Plaintiff, **"Others cannot split their time for you!" (referring to his lab employees).**

131. Previously, Dr. Daniel A. Grande asked Plaintiff to present his data and research projects in the lab meeting in the presence of Dr. Kenneth Zaslav, MD (Attending Orthopedic Surgeon at Lenox Hill Hospital, Director of the Center for Regenerative Orthopedic Medicine, Professor, Donald and Barbara Zucker School of Medicine at Hofstra/Northwell), while following his rejections, Dr. Daniel A. Grande never asked to present Plaintiff's data again.

132. Previously, Dr. Daniel A. Grande encouraged Plaintiff to submit scientific abstracts for conferences, whereas following Plaintiff's rejections of Dr. Daniel A. Grande's sexual advances, Dr. Daniel A. Grande discouraged Plaintiff from going to the Plastic Surgery conference.

133. Previously, Dr. Daniel A. Grande paid for Plaintiff's online course "Stem Cell training" through the lab's budget (cost $650) and allowed Plaintiff to have his own business cards.

134. After Plaintiff rejected his sexual advances, however, Dr. Daniel A. Grande would not purchase the reagents necessary for Plaintiff's PhD work despite Plaintiff had justified the need for them.

135. Previously, Dr. Daniel A. Grande appraised Plaintiff's work on the PSF grant submission, 3-minute video PhD proposal presentation, lab meeting presentations, IACUC protocol submissions and other work Plaintiff performed.

136. However, following Plaintiff's rejections of his sexual advances, Dr. Daniel A. Grande was just critical and negative.

137. Previously, Dr. Daniel A. Grande agreed for Plaintiff to experiment on mice for Plaintiff's doctoral work, while following Plaintiff's rejections of his sexual advances, Dr. Daniel A. Grande reprimanded Plaintiff for not experimenting on rats instead.

138. Previously, Dr. Daniel A. Grande approved Plaintiff working with Dr. Theodoros Karnavas, a researcher at Dr. Lionel Blanc's lab, and even attended meetings with Plaintiff and Dr. Karnavas, while following Plaintiff's rejections of his sexual advances, Dr. Daniel A. Grande refused to authorize such cooperation allegedly due to "high cost" of the experiments relating directly to Plaintiff's doctoral work.

139. Previously, Dr. Daniel A. Grande had no issues with providing Plaintiff with work-related reagents, while following Plaintiff's rejections of his sexual advances, Dr. Daniel A. Grande refused, claiming they were "too expensive".

140. As a result, Plaintiff had to purchase the reagents necessary for his doctoral research out of his own pocket.

141. Plaintiff was not able to tolerate the *quid pro quo* sexual harassment and hostile work environment he was subjected to by his immediate supervisor any longer and decided to voice his concerns.

**Complaint and Retaliation**

142. On March 13, 2022, Plaintiff requested Dr. Kathleen McGill, the VP of Academic Operations and Title IX officer at Feinstein, to provide him with the contact information of the person who conducted the Title IX training on February 7, 2022.

143. On March 14, 2022, upon receipt of the information requested, Plaintiff reported the above-referenced incidents of sexual harassment to April McCarthy, the Campus Education & Outreach Coordinator at The Safe Center LI.

144. Ms. McCarthy said that Dr. Daniel A. Grande's behavior was consistent with sexual harassment at the workplace, and suggested to Plaintiff to speak with Dr. Kathleen McGill, the VP of Academic Operations and Title IX officer at Feinstein instead.

145. On March 15, 2022, following Ms. McCarthy's suggestion, Plaintiff reported the above-referenced incidents of sexual harassment to Dr. Kathleen McGill, the VP of Academic Operations and Title IX officer at Feinstein.

146. Having heard Plaintiff's concerns, Ms. McGill remarked, "**I would not be comfortable with that either!**"

147. Ms. McGill did not take any notes during her meeting with Plaintiff, mentioned nothing about the investigation, and did not explain how she or the Defendants were planning to address the situation.

148. Instead, Ms. McGill encouraged Plaintiff to be "more assertive" in his rejections of Dr. Daniel A. Grande's sexually inappropriate behavior, even though she knew Plaintiff was dealing, among others, with the *quid pro quo* sexual harassment.

149. The same day, on March 15, 2022, Dr. Karnavas asked Plaintiff if he reported Dr. Daniel A. Grande for sexual harassment.

150. Plaintiff responded affirmatively.

151. Plaintiff inquired from Ms. McGill how Dr. Karvanvas became aware of his complaints of sexual harassment against Dr. Daniel A. Grande, but she denied disclosing the same.

152. On or about March 16, 2022, Ms. McGill informed Plaintiff that she "did think about their conversation further" and was "currently making plans for mandatory Title IX training for all faculty within the next week or two".

153. The very next day after Plaintiff shared in confidence his complaints of sexual harassment against Dr. Daniel A. Grande with Ms. McGill, Dr. Daniel A. Grande confronted Plaintiff in the lab after everyone had left and verbally accosted Plaintiff for reporting him to Ms. McGill.

154. In that regard, Dr. Daniel A. Grande entered the lab, and went to Plaintiff's desk, while Plaintiff was changing his clothes and putting his scrubs on.

155. When Dr. Daniel A. Grande approached Plaintiff's desk, Plaintiff was half naked, and pulled his scrub pants quickly to avoid being seen by Dr. Daniel A. Grande.

156. During this incident, Dr. Daniel A. Grande said, among others, that he was longer impressed by Plaintiff, and that his proposal was not that good.

157. Dr. Daniel A. Grande also said that his lab staff is busy, and cannot split their time for Plaintiff.

158. Plaintiff responded that he would hire a lab technician, who would help him to perform procedures, which Dr. Daniel A. Grande did not object to.

159. During this incident, Dr. Daniel A. Grande was yelling, making Plaintiff feel concerned for his safety.

160. During this incident, Dr. Daniel A. Grande did not deny his conduct, and instead kept asking, "Why did you do that?", "You need to apologize to me!", "I was guarantor on your lease, is that the respect you show me?"

161. A few days after Plaintiff reported Dr. Daniel A. Grande to Ms. McGill, Dr. Daniel A. Grande started shouting at Plaintiff in his office for reporting him to Ms. McGill.

162. Dr. Daniel A. Grande closed the door and Plaintiff said, "I am not comfortable with that!" Plaintiff then opened the door to his office.

163. In response to Plaintiff's rejections of his sexual advances, and retaliation against Plaintiff for filing a complaint, Dr. Daniel A. Grande said, "**I am pissed off, you should leave my lab!**"

164. The same day, Plaintiff reported the above-referenced Dr. Daniel A. Grande's behavior to Dr. Stavros Zanos, MD, PhD (Chair of Plaintiff's thesis committee) from the Bioelectronic Medicine department.

165. Dr. Stavros Zanos went to Dr. Grande's office to discuss this. Dr. Zanos was surprised to hear about complaints against Plaintiff (such as that Plaintiff allegedly rely on others for experiments, or that Plaintiff has "an elite" attitude), as previously Dr. Daniel A. Grande told him that Plaintiff was very good, smart and Plaintiff would finish the PhD earlier than expected, and Plaintiff had a good relationship with all lab staff and clinicians.

166. On March 17, 2022, a meeting took place, where Dr. Lionel Blanc, Dr. Daniel A. Grande, Dr. Karnavas, Mr. Papoin, and Plaintiff were present.

167. During said meeting, Plaintiff's project (combining iPSCs and diabetic foot ulcers and osteoarthritis) was discussed.

168. After the meeting was over, Dr. Daniel A. Grande told Plaintiff that he would not pay $10,000 for such a project, even though Plaintiff had spent two months with Dr. Karnavas working on the same.

169. Mr. Papoin also told Dr. Karnavas that he was not happy for Plaintiff to use Dr. Blanc's lab, despite Dr. Lionel Blanc and Dr. Grande had previously agreed to the lab's collaboration, prior to Plaintiff's complaints about the sexual harassment.

170. On March 19, 2022, Ms. McGill allowed Plaintiff to use the swing office and conference room at off hours, in evenings, weekends, and holidays, so he could avoid the sexual harassment he was subjected to by Dr. Daniel A. Grande.

171. No other efforts, however, were made by the Defendants to separate Plaintiff from Dr. Daniel A. Grande.

172. On March 20, 2022, upon asking Dr. Daniel A. Grande to suggest thesis committee members, Dr. Daniel A. Grande proposed to Dr. Lionel Blanc, whom he had previously discouraged Plaintiff from choosing as part of his committee, because Dr. Lionel Blanc allegedly was tough with Dr. Daniel A. Grande's previous MD/PhD student, named Jolanta Norelli.

173. Dr. Norelli, according to Dr. Daniel A. Grande, used to cry after each committee meeting because of the strict assessments from Dr. Blanc, revealing poor mentoring from Dr. Grande.

174. On March 21, 2022, Plaintiff continued to complain about the sexual harassment he was subjected to by Dr. Daniel A. Grande during the meeting with Ms. McGill and Dr. Christine Metz, Associate Dean at Elmezzi.

175. Although Dr. Christine Metz suggested transferring Plaintiff to another lab, none of the labs would accommodate Plaintiff's doctoral research due to his complaints of sexual harassment against Dr. Daniel A. Grande.

176. Plaintiff personally made numerous attempts to get transferred to another lab to no avail and started working late hours to avoid the ongoing sexual harassment he was subjected to by Dr. Daniel A. Grande.

177. On March 21, 2022, Plaintiff met with Dr. Ona Bloom (Professor, Center for Autoimmune, Musculoskeletal and Hematopoietic Diseases) to join her lab, since Dr. Daniel A. Grande had demanded that Plaintiff left his lab in retaliation against him for rejecting his advances and reporting his sexually inappropriate conduct to Ms. McGill and Dr. Metz.

178. Dr. Bloom said she would speak to Dr. Metz first.

179. On March 22, 2022, following her conversation with Dr. Metz, who was aware of Plaintiff's complaints of sexual harassment, Dr. Bloom responded that she could not accommodate Plaintiff.

180. Upon information and belief, other labs would also not accommodate Plaintiff due to the complaints of sexual harassment Plaintiff filed against Dr. Daniel A. Grande.

181. The Defendants repeatedly failed to transfer Plaintiff away from Dr. Daniel A. Grande, allowing *quid pro quo* harassment, hostile work environment and retaliation to continue to escalate.

182. On April 29, 2022, in further retaliation against Plaintiff, Dr. Daniel A. Grande refused to allow Plaintiff to send histology specimens to the Cold Spring Harbor Lab for processing, despite other Elmezzi students (*e.g.*, Sara Siskind) routinely sent the specimens outside Feinstein, thereby depriving Plaintiff of resources.

183. Dr. Daniel A. Grande's retaliatory conduct continued in the form of repeatedly asking Plaintiff to deliver data from his research while Plaintiff was already on the task.

184. In addition, Dr. Daniel A. Grande sabotaged Plaintiff's work by giving him the wrong instructions on how to perform an experiment related to seeding cells on a scaffold.

185. When Plaintiff asked Dr. Daniel A. Grande about that in front of the lab staff during a lab meeting (and in his office on a separate occasion), Dr. Daniel A. Grande falsely said, "I don't know what you're talking about!"

186. On May 2, 2022, Plaintiff arranged a Zoom call with Dr. Daniel A. Grande, Neil Tanna, MD, FACS (Plastic Surgeon at Northwell), and the Pittsburgh team including Peter Rubin, MD, FACS (President of the American Society of Plastic Surgeons) and Kacey Marra, PhD.

187. During the meeting, Dr. Daniel A. Grande talked about one of his previous students, Jolanta Norelli, and her work and ignored Plaintiff's work.

188. Dr. Peter Rubin said, "We are here to help Konstantinos!".

189. On May 3, 2022, Ms. McGill reported Plaintiff's complaints about the sexual harassment to HR.

190. On May 18, 2022, Plaintiff continued to complain about the sexual harassment he was subjected to by Dr. Daniel A. Grande to Alicia Williams (HR) and Mila Capone (HR) via Zoom.

191. Less than a month later, on June 16, 2022, Plaintiff received a letter from Alicia Williams indicating that "a thorough investigation has been completed and appropriate action will be taken" with regard to Plaintiff's complaint, dated May 3, 2022.

192. There was no indication whether the Defendants conducted any investigation into Plaintiff's complaints of sexual harassment against Dr. Daniel A. Grande, which Plaintiff had previously submitted on March 15, 2021, to Ms. McGill; on March 21, 2022 - to Ms. McGill and Dr. Metz; and on May 18, 2022 - to HR.

193. While promptly closing a short-lived investigation into Plaintiff's complaints of sexual harassment, the Defendants, through HR, initiated a pre-textual investigation into Plaintiff's work performance, in an attempt to force Plaintiff out of employment in retaliation against Plaintiff for expressing his rejections and complaining about the sexual harassment.

194. Plaintiff felt overwhelmed with the many projects that Dr. Daniel A. Grande had been intentionally assigning Plaintiff.

195. When Plaintiff asked for guidance, Dr. Daniel A. Grande refused to provide any and said, "That's not my problem!"

196. On May 11, 2022, Plaintiff had a meeting with Ms. McGill, during which Plaintiff continued to voice his concerns about the sexual harassment and retaliation to no avail.

197. On May 19, 2022, Plaintiff presented his thesis proposal to the committee.

198. The Thesis Committee Members included: Dr. Stavros Zanos (Chair), Dr. Barbara Sherry, Dr. Philippe Marambaud, Dr. Annette Lee (Dean) and Dr. Christine Metz.

199. Dr. Daniel A. Grande adversely contributed to the decision of the thesis committee.

200. Despite Dr. Daniel A. Grande's retaliatory actions, the overall assessment by the thesis committee was "satisfactory" and Plaintiff passed his qualifying exam.

201. The following was noted in the Thesis Committee Meeting Report: "certain aspects of the studies are challenging and require closer collaboration with Dan Grande's team".

202. The Defendants failed to take immediate corrective action to prevent the ongoing discriminatory practice, and continually required Plaintiff to work closely with Dr. Daniel A. Grande, despite the reported sexual harassment.

203. Dean Annette T. Lee, PhD asked Dr. Daniel A. Grande and Plaintiff to sign a manual ("Compact") describing the duties of mentors and mentees.

204. Dr. Daniel A. Grande violated the regulations for his duties as a mentor in retaliation against Plaintiff for rejecting his sexual advances and complaining about the sexual harassment.

205. Dr. Daniel A. Grande continued to sabotage Plaintiff's work by failing to provide guidance and ignoring Plaintiff's work-related emails.

206. On June 7, 2022, Plaintiff was informed by Dr. Hudson Liang that Ms. McGill also had the authority to approve orders necessary for Plaintiff's PhD work, which Dr. Daniel A. Grande, PhD had repeatedly ignored in retaliation against Plaintiff.

207. However, when Plaintiff reached out to Ms. McGill so that she could approve the order of materials, which Plaintiff had previously discussed in detail during his thesis committee meeting, she responded that Dr. Daniel A. Grande still had to review and approve the order, even though Plaintiff informed her that his work-related emails had been ignored by Dr. Daniel A. Grande.

208. Plaintiff's thesis committee refused to let Plaintiff go to the Pittsburgh lab to get support for his ongoing research needs which remained unmet in Dr. Daniel A. Grande's lab.

209. On June 8, 2022, Dr. Daniel A. Grande blamed Plaintiff for failing to obtain a grant, even though he had previously said that Plaintiff's application was good for submission.

210. Dr. Daniel A. Grande continually sabotaged Plaintiff in retaliation against him by leaving Plaintiff with scarcity of resources.

211. In or around June 2022, Plaintiff submitted an anonymous complaint to Dr. Betty Diamond regarding Dr. Daniel A. Grande sabotaging Plaintiff with scarcity of resources.

212. Specifically, Plaintiff mentioned that Plaintiff was only given 5 scaffolds to perform his entire PhD work during the next 3 years, although Plaintiff would need at least 30-40 scaffolds for the entire 3-year program to work comfortably.

213. A scaffold is a 3D cell culture system, like a honeycomb, where cells attach and grow.

214. On or about July 20, 2022, Plaintiff saw Dr. Betty Diamond in Dr. Daniel A. Grande's office.

215. Dr. Daniel A. Grande also acknowledged that he and Dr. Diamond had a meeting.

216. Dr. Diamond took no immediate corrective action in response to Plaintiff's complaints about Dr. Daniel A. Grande's behavior, which was clearly retaliatory.

217. On June 17, 2022, in a meeting with Dean Annette T. Lee, PhD and Dr. Metz, Dr. Metz suggested that James Devoti be part of Plaintiff's meetings with Dr. Daniel A. Grande as James Devoti helped Plaintiff with the PCR (polymerase chain reaction) technique.

218. Later, on June 23, 2022, in a meeting with Dean Annette T. Lee, PhD, Dr. Daniel A. Grande, and his lab manager, Dr. Hudson Liang, Dean Annette T. Lee, PhD said that James Devoti was not available for the meeting.

219. When Plaintiff inquired from James Devoti regarding his availability, he said Dr. Daniel A. Grande did not want him to be part of the meetings, further depriving Plaintiff of help in his research.

220. During said meeting on June 17, 2022, Dr. Metz also suggested to Plaintiff to press a reset button, and restore his professional relationship with Dr. Daniel A. Grande.

221. Plaintiff advised Dr. Lee and Dr. Metz that his complaints to HR about Dr. Daniel A. Grande's sexually harassing conduct affected his communication and mentorship, but Plaintiff's concerns fell on deaf ears.

222. On June 23, 2022, following said meeting, Plaintiff wrote an email to Dr. Lee and Dr. Metz where he complained, among others, about Dr. Daniel A. Grande socially isolating Plaintiff, having no interest in mentoring or supporting Plaintiff in his endeavors, or transforming Plaintiff into a surgeon-scientist, which is a big goal of the entire Elmezzi program.

223. On June 26, 2022, Plaintiff sent another email to Ms. Freeman, Ms. Williams, *etc.*, indicating, among others, that during the June 23, 2022 meeting, he observed that Dr. Lee and Dr. Daniel A. Grande exchanged many smiles, while Dr. Daniel A Grande stared at Plaintiff in a hostile manner.

224. Plaintiff expressed that he felt like there was a conflict of interest. Plaintiff's concerns were made to no avail.

225. On June 28, 2022, the Defendants, through their agents and employees (Dean Annette T. Lee, PhD) called Plaintiff into a meeting to conduct an investigation into Plaintiff's performance, in retaliation against Plaintiff for voicing his concerns about the sexual harassment.

226. Dean Annette T. Lee, PhD said, "I was asked by HR to perform this investigation!"

227. Mr. Jonathan Cohen, JD, the Chief Operating Officer of the Feinstein, Dr. Annette T. Lee's superior was present and was taking notes, instead of Dr. Metz who, according to Dean Annette T. Lee, PhD, was unavailable.

228. During this pre-textual "investigation", Dean Annette T. Lee, PhD was constantly trying to put Plaintiff in the corner and gather evidence against him. Her facial expressions revealed distrust and anger against Plaintiff.

229. On July 5, 2022, Plaintiff complained to Kristina Freeman, Director of HR Site Business Partner, that Dean Annette T. Lee, PhD was retaliating against Plaintiff because he reported her senior academician and friend, Dr. Daniel A. Grande, to HR for sexual harassment.

230. Plaintiff also requested information about his rights for legal representation during the pre-textual investigations he was subjected to by the Defendants and requested a copy of Northwell policy.

231. Plaintiff's request was ignored.

232. On July 11, 2022, only six days after Plaintiff's complaint about retaliation, Ms. Freeman (HR) advised Plaintiff that the Defendants "were not able to substantiate [Plaintiff's] claims" and "considered matter closed".

233. On July 18, 2022, Plaintiff was handed by Dr. Annette T. Lee, PhD a Final Written Warning with the comment "HR told me to give you this!" in the presence of Dr. Metz.

234. The Final Warning the Defendants issued to Plaintiff was purely pre-textual and retaliatory; it contained numerous inconsistencies and inaccuracies.

235. By way of example, the Defendants falsely accused Plaintiff in admitting without permission a non-Northwell member into the lab on April 17, 2022.

236. Dr. Daniel A. Grande and Dean Annette T. Lee, PhD, however, were aware that Plaintiff would be involving an outside personnel to help him in the lab, since Dr. Daniel A. Grande himself provided zero support following Plaintiff's rejections of his sexually inappropriate behavior.

237. In addition, the Defendants falsely accused Plaintiff in failing to adhere to the Identification Badge policy and inappropriately interacting with a security officer on April 21, 2022, even though prior to Plaintiff's complaints of sexual harassment Plaintiff was never prevented from entering the building even if Plaintiff left his ID at home or in the lab.

238. It was only after Plaintiff reported Dr. Daniel A. Grande for sexual harassment that the Defendants started reviewing cameras in an attempt to find a pre-textual reason to force Plaintiff out.

239. In addition, the Defendants falsely accused Plaintiff in violating his manager's instructions regarding the purchase of lab rats for his experiment in or around February 2022, even though Dr. Daniel A. Grande, PhD had previously instructed Plaintiff to take leadership and he had no issues with Plaintiff experimenting on rats.

240. The only concern that Dr. Daniel A. Grande raised with Plaintiff was the cost of feeding and boarding. Actually, CCP (Center for Comparative Physiology) staff placed the order for Plaintiff and the attending veterinarian, named Lotus Altholtz, was aware of the same.

241. Finally, in the Final Written Warning, the Defendants falsely accused Plaintiff of "appearing aggressive" with the registration staff member when Plaintiff was asked to show his Covid-19 vaccination card on or about June 8, 2022, during the Ross Prize in Molecular Medicine at New York Academy of Sciences.

242. To support their pre-textual and baseless write-up, the Defendants collected statements from other employees, who reported directly to Dr. Daniel A. Grande (*i.e.* Lotus Altholtz, veterinarian, and Dr. Hudson Liang, the lab manager).

243. In further retaliation against Plaintiff for rejecting Dr. Daniel A. Grande's sexual advances, and reporting sexual harassment, Dr. Daniel A. Grande continued to neglect his duties as a doctoral candidate's mentor.

244. When Plaintiff had work-related questions, Dr. Daniel A. Grande refused to address them, and brushed Plaintiff off, saying "My lab staff and I are busy!"

245. In further retaliation against Plaintiff for rejecting Dr. Daniel A. Grande's sexual advances, Plaintiff was socially isolated at the workplace.

246. For example, Dr. Daniel A. Grande would take out all employees for lunch without informing Plaintiff, while Plaintiff would be left alone eating lunch at Northwell cafeteria.

247. On August 9, 2022, Dr. Daniel A. Grande shouted at Plaintiff to leave his lab.

248. Plaintiff reported said incident to Dean Annette T. Lee, PhD and Dr. Metz with whom Plaintiff had a meeting the next day.

249. To Plaintiff's dismay, Dr. Lee and Dr. Metz refused to allow Plaintiff to collaborate with Roche C. DeGuzman, PhD Associate Professor of bioengineering at Hofstra Medical School, and they both seemed to cover up Dr. Daniel A. Grande's harassment against Plaintiff.

250. When Plaintiff questioned Dean Annette T. Lee about the validity of the final disciplinary warning given to him, she said, "I don't know what you're talking about, I did not write the letter!"

251. On August 9, 2022, a lab meeting took place, during which summer students and one PhD student presented their work.

252. Plaintiff was never informed about the upcoming presentation, and was deprived of this amazing opportunity to present his data and get useful feedback, which adversely affected Plaintiff's employment.

253. On numerous other occasions, Plaintiff heard Dr. Daniel A. Grande talking about Plaintiff behind his back to other lab staff with his door open while Plaintiff was walking in the corridor past his office.

254. Dr. Daniel A. Grande then sarcastically inquired from Plaintiff whether he was able to make any friends at Northwell.

255. At the beginning of August 2022, in further retaliation against Plaintiff, Dr. Daniel A. Grande reported Plaintiff for scientific misconduct to Ping Wang, MD, the Chief Scientific Officer at Feinstein based on false allegations pertaining to the writing of an unpublished review paper which was still being drafted.

256. Dr. Daniel A. Grande wanted to be the senior co-author on the paper without having contributed to it whatsoever.

257. One month prior to Plaintiff's committee meeting, on August 8, 2022, Daniel A. Grande said, "I think you should find a new mentor, not a co-mentor!"

258. When Plaintiff reached out to Dr. Lance Becker, MD to become Plaintiff's co-mentor, Dr. Becker never responded to Plaintiff, upon his conversation with Dr. Daniel A. Grande.

259. During the following weeks leading up to the thesis meeting, Dr. Daniel A. Grande did not speak to Plaintiff when Plaintiff said "Good morning!" to him, while he greeted everyone else in the lab.

260. Dr. Daniel A. Grande did not reach out to Plaintiff to check on his PhD progress while Plaintiff was working hard to obtain data for his research.

261. Dr. Daniel A. Grande seemed constantly angry and frustrated towards Plaintiff, which made it extremely hard for Plaintiff to collaborate with him and ask him questions regarding Plaintiff's project.

262. In or around August 2022, Dr. Daniel A. Grande said, "**I will come to the meetings, but I have no interest in mentoring!**"

263. Plaintiff reported the above-referenced comment to Dr. Metz to no avail.

264. On or about August 10, 2022, a meeting took place where Dr. Metz, and Dean Annette T. Lee, PhD were present.

265. During said meeting, Plaintiff observed Dean Annette T. Lee, PhD not taking notes when Plaintiff was referring to Dr. Daniel A. Grande's retaliatory behavior, and she was constantly trying to justify or cover up his misconduct, saying, "He is a good guy, I know him for so many years!"

266. While preparing for the September 6, 2022 thesis meeting, Plaintiff went through his presentation and data with Dr. Daniel A. Grande to get his feedback.

267. Not only Dr. Daniel A. Grande did not provide any useful comments, he assigned Plaintiff to start a new unnecessary experiment (Picogreen assay) two weeks prior to the committee meeting.

268. When Plaintiff asked Dr. Daniel A. Grande to assign a lab member to help him with this assay, Dr. Daniel A. Grande did not respond to Plaintiff's email.

269. In contrast, Dr. Daniel A. Grande assigned Vaughn Greene, PhD candidate to help Travis Peng with 3D printing, as Travis had just joined the lab as an MD/PhD Scholar.

270. A week prior to Plaintiff's thesis committee meeting scheduled for September 6, 2022, Dr. Daniel A. Grande performed an individual development program (IDP) assessment of Plaintiff's performance upon Plaintiff's request as mandated by the Elmezzi program.

271. All his assessments were worse than Plaintiff's first IDP assessment on November 22, 2021, prior to Plaintiff rejecting Dr. Daniel A. Grande's sexual advances.

272. Dr. Daniel A. Grande did not provide any constructive feedback to Plaintiff on how to improve or any advice or guidance.

273. Dr. Daniel A. Grande reviewed Plaintiff's progress report prior to Plaintiff sending it to the committee members, and made no changes to it whatsoever.

274. After sending the report, on September 1, 2022, Dean Annette T. Lee, PhD remarked that Plaintiff's update was not very informative with respect to what Plaintiff had accomplished.

275. Most updates, however, had specific accomplishments rather than just a general statement.

276. Dr. Daniel A. Grande set Plaintiff up for failure in further retaliation against him for rejecting his sexual advances.

277. On September 6, 2022, Plaintiff attended the committee meeting regarding his thesis, where Dean Annette T. Lee, PhD, Dr. Daniel A. Grande, PhD and Stavros Zanos, MD, PhD, the Chair of Committee, Barbara Sherry, PhD, and Philippe Marambaud, PhD, were present.

278. During the meeting Plaintiff was asked many questions, and repeatedly told by Dr. Zanos, "Please accelerate, I need to leave by 3p.m!"

279. At the end of the meeting Plaintiff was falsely accused of being too quick to dismiss the committee's proposals, even though Plaintiff was continually rushed throughout his presentation.

280. At some point during said meeting, Dr. Zanos said, "Now I understand why your relationship with your mentor is bad!"

281. He was referring to Dr. Daniel A. Grande, and the professional work relationship that soured following Plaintiff's complaints of sexual harassment.

282. Dr. Daniel A. Grande, PhD asked Plaintiff a question related to his experiments which was outside the protocol, as mentors were not allowed to raise questions or comments during their mentees' presentations.

283. Nevertheless, Plaintiff provided a substantive response to his questions.

284. At the end of the meeting, and while still getting feedback from the Chair, Plaintiff asked when the next meeting would be, and Dean Annette T. Lee, PhD walked away from the room in obvious anger and frustration.

285. Dr. Daniel A. Grande tried to systematically ruin Plaintiff's reputation and damage both his personal and professional life – all in retaliation against Plaintiff for rejecting his advances and reporting his unlawful conduct.

286. In the following days, Dr. Daniel A. Grande approached Plaintiff and said, "**It was benign what I said!**" pertaining to his sexual comments.

287. He then said, "**Take away your complaints!**" and "**the ACC (Advice and Counsel C)/HR asked me to sign a document**"

288. Later, Dr. Daniel. A. Grande inquired from Plaintiff whether he was going to file a lawsuit against him personally, and expressed doubt in the likelihood of Plaintiff prevailing.

289. Dr. Daniel A. Grande also told Plaintiff that if the Defendants terminated Plaintiff, he would have three months to leave the United States.

**Disability Discrimination**

290. As the result of the Defendants' unlawful employment practices, Plaintiff suffered and continues to suffer severe emotional distress, including, but not limited to, anxiety and depression.

291. As the result of foregoing, Plaintiff has been treated by a therapist since January 6, 2022.

292. Plaintiff suffered from a mental impairment, which, upon the provision of reasonable accommodation, did not prevent him from performing his duties in a reasonable manner.

293. When Plaintiff informed Daniel A. Grande, PhD about the nature of his medical condition and his intention to take the mental health leave, he responded, "**If you have mental health issues, go figure your life!**", "**I don't feel safe for you to work in my lab!**", "**You should leave my lab!**", "**I don't want to do anything with you!**", "**I'm a full Professor, I can kick you out any time!**", "**I don't owe you anything else what I already gave you!**", "**I take no responsibility for anything I tell you!**".

294. Dr. Daniel A. Grande regarded Plaintiff as having such a mental impairment.

295. On July 8, 2022, Plaintiff, through counsel, requested a reasonable accommodation related to his medical condition (anxiety, depression).

296. On July 22, 2022, Dr. Alex Treitel, MD recommended Plaintiff to take a mental health leave from July 25, 2022 through August 2, 2022.

297. From July 25, 2022, through August 2, 2022, Plaintiff took a leave of absence for mental health, as instructed by his doctor, due to the stress Plaintiff experienced as the result of the Defendants' discriminatory practices.

298. Plaintiff sent a doctor's note to Dr. Daniel A. Grande, Dr. Annette T. Lee, PhD and Dr. Christine Metz, to which Plaintiff received no response.

299. On or about August 10, 2022, upon Plaintiff's return from his short-term disability leave, Dr. Daniel A. Grande continued making comments targeting Plaintiff mental health, saying "**I don't feel safe for you to work in my lab!**"

300. This was not the first time Dr. Daniel A. Grande made comments targeting employees' medical conditions.

301. Dr. Daniel A. Grande told Plaintiff that Andrew Wang, a bioengineer in the lab, had some history of mental health treatment, and called him "Weirdo" because of that, which Plaintiff found to be inappropriate. Eventually, Andrew Wang left the lab.

**Further Retaliation**

302. On or about September 13, 2022, Plaintiff heard Kevin Tracey, the President of Elmezzi and CEO of Feinstein, telling Dr. Daniel A. Grande in his office: "How are you? I know what's going on, It'll be fine...!"

303. In or around September 2022, Dr. Daniel A. Grande informed Plaintiff that Neil Tanna wrote him a letter saying that Plaintiff was allegedly "unprofessional and unethical".

304. Neil Tanna's statement was untrue and biased.

305. Dr. Daniel A. Grande previously told Plaintiff that his wife had received Botox treatment at Dr. Neil Tanna's office.

306. On September 16, 2022, upon discussing these false allegations against Plaintiff with Neil Tanna on the phone, Neil Tanna said to Plaintiff that he was "being used to write these", he did not know the background between Dr. Daniel A. Grande and Plaintiff, and he felt he was "caught up in this".

307. On September 18, 2022, via email, Plaintiff suggested to Neil Tanna to retract his false allegations against Plaintiff such as that he was "unethical" or "unprofessional".

308. In said email, Plaintiff also informed Neil Tanna that he felt obligated to report Neil Tanna's statement to HR as a form of retaliation against Plaintiff.

309. From September 14, 2022 to September 25, 2022, Plaintiff took additional time off to avoid exacerbation of the emotional distress he already suffered as the result of the Defendants' discriminatory actions.

310. While Plaintiff was still on PTO, Plaintiff received a letter from Andrew C. Yacht, M.D., dated September 21, 2022, suspending Plaintiff until further notice, pending "an investigation of allegations of [Plaintiff's] threatening, bullying and harassing behavior directed toward individuals employed by, or otherwise affiliated with Northwell".

311. On September 22, 2022, Plaintiff, through counsel, submitted a written complaint of retaliation.

312. On October 6, 2022, Plaintiff reached out to Kathleen A. Donovan, the Regional HR Officer, requesting to discuss, among others, the retaliation Plaintiff was subjected to by Dr. Daniel A. Grande and discrimination against him based on his medical condition.

313. Plaintiff requested a transfer to another lab, so that Plaintiff could continue his PhD work.

314. Although the Defendants offered to meet with Plaintiff regarding his complaints of retaliation on October 13, 2022 via Zoom, Plaintiff was not allowed to have his counsel present and was not advised who else would be attending the meeting, despite Plaintiff's repeated requests.

315. Previously, the Defendants inaccurately summarized the verbal statements Plaintiff actually made, and purported admissions Plaintiff never made.

316. As such, Plaintiff was left with no preventive or corrective opportunities to stop the ongoing retaliation.

317. On October 21, 2022, in retaliation against Plaintiff for reporting the Defendants' discriminatory practices, Plaintiff was terminated based on some unspecified policy violations.

318. In further retaliation against Plaintiff, his PhD program at Elmezzi was terminated.

319. Plaintiff was thus deprived of an opportunity to complete his 3 years in residency.

320. In further retaliation against Plaintiff, the Defendants falsely reported Plaintiff to the Department of Homeland Security that Plaintiff allegedly "violated the rules governing his exchange visitor program".

321. Based on foregoing, the Defendants unlawfully discriminated against Plaintiff, subjected him to a *quid pro quo* sexual harassment, hostile work environment, and retaliation on the basis of his sex, sexual orientation and disability.

322. Dr. Lee aided and abetted Dr. Daniel A. Grande's and corporate Defendants' unlawful discriminatory practices against Plaintiff.

323. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, loss of career progression and academic opportunities for employment, the loss of a salary, bonuses, benefits, and other compensation which such

employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

324. As the result of the Defendants' unlawful discriminatory practices, Plaintiff suffered and continues to suffer severe emotional distress.

325. As Defendants' conduct has been willful, reckless, outrageous, intentional, and/or malicious, Plaintiff also demands punitive damages in an amount which exceeds the jurisdictional limits of all lower Courts.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of Title VII

326. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

327. Pursuant to 42 USCS § 2000e-2(a)(1), it shall be an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's sex.

328. Pursuant to 42 USCS § 2000e (m), an unlawful employment practice is established when the complaining party demonstrates that sex was a motivating factor for any employment practice, even though other factors also motivated the practice.

329. The corporate Defendants, through their agents and employees, unlawfully discharged and discriminated against Plaintiff with respect to the terms, conditions, and privileges of his employment, because of his sex.

330. As the direct and proximate result of these corporate Defendants' unlawful employment practices, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

35

## SECOND CAUSE OF ACTION
### *Quid Pro Quo* Sexual Harassment In Violation of Title VII

331. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

332. Pursuant to Section 2000e-2(a), it shall be an unlawful employment practice for an employer (1) to ... discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's sex.

333. Pursuant to 29 CFR 1604.11, unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

334. The Corporate Defendants, through their agents and employees (Dr. Daniel A. Grande) unlawfully subjected Plaintiff to *quid pro quo* sexual harassment.

335. As a direct and proximate result of the Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### Hostile Work Environment in Violation of Title VII

336. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

337. Pursuant to Section 2000e-2(a), it shall be an unlawful employment practice for an employer - (1) to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex.

338. The Supreme Court has held that Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

339. Corporate Defendants, through their agents and employees, unlawfully subjected Plaintiff to a hostile work environment.

340. As a direct and proximate result of the Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of Title VII

341. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

342. Pursuant to Section 2000e-3(a), it shall be an unlawful employment practice for an employer to discriminate against any individual, because he has opposed any practice made an unlawful employment practice under Title VII.

343. The Corporate Defendants, through their agents and employees, unlawfully retaliated against Plaintiff for reporting the sexual harassment.

344. As a direct and proximate result of the Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## FIFTH CLAIM FOR RELIEF
### Sex-Based Discrimination in Violation of NYSHRL

345. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

346. Pursuant to § 296 (1) (a) of NYSHRL, it shall be an unlawful discriminatory practice, for an employer, because of an individual's sex and sexual orientation, to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

347. Individual liability under § 296(1) lies only where a defendant actually participates in the conduct giving rise to discrimination, and is limited to individuals with ownership interest or supervisors, who themselves have the authority to hire and fire employees.

348. The Defendants unlawfully discriminated against Plaintiff in compensation, terms, conditions and privileges of his employment because of his sex and sexual orientation.

349. As a direct and proximate result of the Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

**SIXTH CLAIM FOR RELIEF**
**Hostile Work Environment in Violation of NYSHRL**

350. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

351. Pursuant to § 296 (1) (h) of NYSHRL, it shall be an unlawful discriminatory practice, for an employer to subject any individual to harassment because of an individual's sex, sexual orientation, disability or because the individual has opposed any practices forbidden by NYSHRL, regardless of whether such harassment would be considered severe or pervasive. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. The fact that such an individual did not make a complaint about the harassment to such employer shall not be determinative of whether such employer will be liable.

38

352. The Defendants unlawfully subjected Plaintiff to *quid pro quo* sexual harassment and hostile work environment, which rises above level what a reasonable victim of discrimination with the same protected characteristic would consider petty slights or trivial inconveniences.

353. As a direct and proximate result of the Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

**SEVENTH CLAIM FOR RELIEF**
**Retaliation in Violation of NYSHRL**

354. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

355. Pursuant to § 296 (1) (e) of NYSHRL, it shall be an unlawful discriminatory practice for any employer to discharge or otherwise discriminate against any person because he has opposed any practices forbidden by NYSHRL.

356. Pursuant to § 296 (7) of NYSHRL, it shall be an unlawful discriminatory practice for any person engaged in any activity to which NYSHRL applies to retaliate or discriminate against any person because he has opposed any practices forbidden by NYSHRL.

357. The Defendants engaged in an unlawful discriminatory practice by retaliating, continuing and escalating the discrimination and hostile work environment to which the Plaintiff was subjected, terminating Plaintiff, and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Defendants.

358. As a direct and proximate result of the Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

## EIGHTH CAUSE OF ACTION
### Title IX Violation

359. Title IX, 20 U.S.C. § 1681 (a) (1972), provides in pertinent part that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

360. Title IX regulates private schools which choose to receive federal funding. Title IX provides a private cause of action against a recipient of federal funds for discrimination based on sex, sexual harassment, and sexual abuse. Based on foregoin, Plaintiff was subjected to severe and objectively offensive sexual harassment for Title IX purposes.

361. Elmezzi, upon information and belief, was a recipient of Federal financial assistance, and thus subject to Title IX.

362. Specifically, professors from various labs at Elmezzi/Feinstein applied and received NIH/federal grants.

363. Elmezzi is a component of Northwell, a not-for-profit corporation, and, upon information and belief, has been exempt from paying federal taxes.

364. Elmezzi, through their agents and employees, unlawfully discriminated against Plaintiff with respect to the terms, conditions, and privileges of his employment, and unlawfully terminated Plaintiff because of his sex and sexual orientation.

365. As a direct and proximate result of the Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under applicable federal and state law;

b. An injunction against the Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c. Declaring that the Defendants engaged in unlawful employment practices prohibited by the Title VII, and awarding Plaintiff a recovery for damages sustained;

d. Declaring that the Defendants engaged in unlawful employment practices prohibited by the NYSHRL, and awarding Plaintiff a recovery for damages sustained;

e. Declaring that Elmezzi engaged in unlawful employment practices prohibited by the Title IX, and awarding Plaintiff a recovery for damages sustained;

f. Declaring that the Defendants discriminated against and retaliated against and terminated Plaintiff on the basis of his sex, sexual orientation and disability and awarding Plaintiff a recovery for damages sustained;

g. Awarding damages to Plaintiff, retroactive to the date of his termination, for all lost wages and benefits resulting from the Defendants' unlawful employment practices in an amount that exceeds the jurisdictional limit of all lower courts;

h. Awarding Plaintiff compensatory damages for his mental and emotional injuries in an amount that exceeds the jurisdictional limit of all lower courts;

i. An award of prejudgment and post-judgment interest;

j. An award of punitive damages where applicable;

k.  An award of costs and expenses of this action together with reasonable attorneys' and expert fees;

l.  Such other relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the FRCP, Plaintiff demands a trial by jury.

Dated: October 2, 2023
    New York, New York

                                   Respectfully submitted,
                                   Akin & Salaman

                                   */s/ Olena Tatura*

                                   Olena Tatura, Esq.
                                   45 Broadway, Suite 1420 New York, NY 10006 (212) 825-1400
                                   olena@akinlaws.com
                                   *Counsel for Plaintiff*